# UNITED STATES DISTRICT COURT

FILED
NOV 2 6 2007
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

___NORTHERN___ DISTRICT OF ___ILLINOIS, EASTERN DIVISION___

UNITED STATES OF AMERICA

v.

LADONTE BELL

MAGISTRATE JUDGE COLE

CRIMINAL COMPLAINT

CASE NUMBER: 07CR 774

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about April 11, 2007, at Aurora, in Kane County, in the Northern District of Illinois, Eastern Division, defendant LADONTE BELL

knowingly and intentionally distributed a controlled substance, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance,

in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Special Agent, ATF, and that this complaint is based on the following facts:

See attached Affidavit.

Continued on the attached sheet and made a part hereof:  _X_ Yes  __ No

David J. Balkema, Special Agent, ATF
Signature of Complainant

Sworn to before me and subscribed in my presence,

November 26, 2007                    at    Chicago, Illinois
Date                                         City and State

JEFFREY COLE, U.S. Magistrate Judge
Name & Title of Judicial Officer           Signature of Judicial Officer

STATE OF ILLINOIS        )
                         ) ss
COUNTY OF KANE           )

## AFFIDAVIT

I, David J. Balkema, being duly sworn under oath state as follows:

1. I am a Special Agent, U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), currently assigned to the Chicago Field Division's Fox Valley Gang Task Force, and have been so employed for seventeen years. I have received specialized training in the enforcement of the federal firearm and narcotics laws, including detailed instruction in the areas of drug identification, investigative techniques, criminal law, undercover operations, informant development and handling, physical and electronic surveillance, and the debriefing of defendants, witnesses, and informants. My training has also included instruction on the various methods and procedures utilized by drug organizations to illegally import, transport, and distribute controlled substances and listed chemicals used to manufacture controlled substances, as well as the methods drug organizations use to launder and conceal proceeds of their drug trafficking and protect these operations through intimidation and violence.

2. During the course of my career, I have been involved in several hundred investigations related to street gang organizations, their use of firearms and their distribution of controlled substances, either as a case agent or in a supporting role. I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, the questioning of witnesses, the use of informants, undercover operations, the use of pen registers, and the interception of wire

communications. I have debriefed numerous defendants, informants, and witnesses who have personal knowledge regarding drug trafficking organizations. As a result, I am familiar with the methods of operation of narcotics traffickers, including the distribution, storage, and transportation of narcotics, and the collection of the proceeds of narcotics trafficking and money laundering, in violation of Title 21, United States Code, Sections 841, 843, 846, 952, 960, 963, and Title 18, United States Code, Sections 1956.

3. The information set forth in this affidavit is based upon my review of documents and reports related to this investigation, and information conveyed to me by other local, state, and federal law enforcement officers. Because this affidavit is made for the limited purpose of establishing probable cause in support of the attached criminal complaint against Ladonte BELL, it does not contain everything that I know, or other law enforcement officers know, about Ladonte BELL or the events described herein. Specifically, the following paragraphs are accurate summaries, including verbatim passages, from the reports and statements (to Affiant) of Illinois State Police (ISP) Special Agent Kevin Garcia (Special Agent Garcia). Further, Special Agent Garcia told Affiant that Special Agent Garcia's reports are based on his own observations, observations of other law enforcement officers conveyed to him, and the undercover recordings, which Special Agent Garcia listened to.

4. In or about January 2007, a confidential informant ("the CI") was approached by members of law enforcement in connection with the CI's suspected participation in narcotics trafficking in and about Aurora, Illinois. When the CI was approached, he/she expressed a desire to assist law enforcement with respect to other

individuals the CI knew were distributing narcotics in Aurora. Since that time, the CI has voluntarily been cooperating with law enforcement. Except for traffic charges, the CI is not now facing criminal charges in any jurisdiction. The CI has been paid for cooperation he/she has provided law enforcement. No promises or representations have been made to the CI regarding any of his/her previous illegal acts. The information provided by the CI has been corroborated by independent investigation that included physical surveillance, consensually recorded telephone calls, and controlled purchases of narcotics. The CI's criminal history includes convictions for offenses involving dangerous drugs, illegal weapons, damage to property, and obstructing justice.

5.   On April 09, 2007, Special Agent Garcia and Inspector Chuck Pierce met with the CI at a pre-determined location. During this meeting, the CI advised Special Agent Garcia that he/she could purchase crack cocaine from Ladonte BELL. The CI advised Special Agent Garcia that he/she could call BELL, order crack cocaine, and then meet BELL in Aurora, Illinois, to purchase this crack cocaine. According to the CI, BELL is also known to him/her as "GOLDMOUTH" or "GOLD" and knows him to be a drug trafficker operating in Aurora, Illinois.

6.   Also on April 09, 2007, at approximately 7:18pm, BELL contacted the CI from cellular telephone number (630) 306-5128. During this consensually recorded conversation, the CI asked BELL to meet him/her at the Brown's Chicken Restaurant located on Galena Boulevard in Aurora, Illinois (2115 W. Galena Blvd.), to which BELL agreed.

7.      At approximately 7:30pm ISP Inspector Pierce searched the CI's vehicle for contraband with negative results. At approximately 7:52pm, ISP Special Agent Garcia searched the CI's person for contraband or currency with negative results. Special Agent Garcia located $61.00 on the person of the CI which he secured.

8.      At approximately 7:54pm an audio recording device placed on the person of the CI was activated by Special Agent Garcia. Also at 7:54pm, BELL called the CI and asked his/her location. The CI advised BELL that he/she was right down the street and would be right there. At approximately 7:55pm, Special Agent Garcia provided the CI with $560.00 to be utilized by the CI to purchase crack cocaine from BELL.

9.      At approximately 7:56pm the CI drove his/her vehicle and departed the pre-determined location and was followed by Special Agent Garcia to the Brown's Chicken where the CI arrived at approximately 7:58pm (as observed by Special Agent Garcia). At approximately 8:01pm, BELL contacted the CI to determine his/her location. The CI advised BELL he/she was parked in the second or third row by the Brown's Chicken Restaurant. As observed by surveillance agents, at approximately 8:03pm, a 2004, White, Chevrolet Impala bearing Illinois registration 455 5105 parked next to the CI's vehicle. The CI then exited his/her vehicle and entered the Impala. The CI then met with BELL who, in summary, advised him/her, in a recorded conversation, that the crack cocaine only weighed 23 grams and that he (BELL) only wanted $550.00 for it. BELL also stated that he was not going to lie and that he only had some bags (referring to crack cocaine) left. The CI then asked BELL when he would have more crack cocaine, and BELL replied probably the next day. BELL also stated his little brother had two (2) ounces of crack cocaine left, but that he (BELL) did not know what his brother

4

was going to do with it. The CI then asked BELL if he would be able to get 63 grams of crack cocaine, and Bell replied he should be able to. BELL then stated he could go get the two ounces of crack cocaine from his little brother because all he (BELL) had left were some bags. BELL advised the CI to call him in ten minutes. At approximately 8:05pm, the CI exited the Impala, and both he/she and BELL departed the area in separate directions.

10. Law enforcement followed the CI back to a pre-determined location, where he/she turned over a plastic bag containing a chunky yellow substance (suspect crack cocaine) to Special Agent Garcia. ISP Inspector Pierce then searched the CI and his/her vehicle for contraband with negative results. Special Agent Garcia weighed and field tested the suspect crack cocaine and found that it weighed approximately 23.7 grams and tested positive for the probable presence of cocaine.

11. Also on April 09, 2007, ATF Task Force Special Agent Greg Spayth queried Aurora, Illinois, Police Department Records and determined that Ladonte T. BELL had been arrested in the 2004 Chevrolet Impala bearing Illinois registration 455 5105 on March 28, 2007, for Operating an Uninsured Motor Vehicle.

12. On April 11, 2007, ISP Sergeant Bill Backus and Special Agent Garcia again met with the CI at a pre-determined location at which time the CI stated that he/she could contact BELL at cellular telephone number (630) 306-5128 and request 63 grams of crack cocaine from him. Special Agent Garcia further displayed a six photograph array of similar black male subjects, and the CI identified subject #4 (Ladonte T BELL M/B DOB: 11/24/1976) as Ladonte BELL and the person from whom the CI purchased the 23.7 grams of crack cocaine on April 9, 2007.

13.     Also on April 11, 2007, at approximately 2:50 p.m., at the direction of law enforcement officers, the CI placed a consensually recorded phone call to BELL at telephone number (630) 306-5128. During that conversation, BELL and the CI discussed a better price for the 63.0 grams of crack cocaine during which BELL advised the CI he would see what he (BELL) could do. BELL further stated he would call the CI back in 10 minutes. After the phone call, law enforcement agents searched the CI's vehicle for contraband with negative results.

14.     Between 3:19pm and 3:33pm the CI attempted to call BELL at cellular telephone number (630) 306-5128 three times, and at cellular telephone number (630) 386-6035 two times, with no answer.

15.     At approximately 3:44pm, at the direction of law enforcement officers, the CI placed a consensually monitored phone call to Joshua HINES, whom the CI knows to be a friend of BELL's, at cellular telephone number (630) 392-9882, in an attempt to contact BELL. HINES answered this call, at which time the CI asked to speak with BELL, who got on the phone. During this conversation BELL advised the CI he would call him/her right back. BELL also asked the CI if he/she had been trying to call his cell phone, to which the CI replied in the affirmative.

16.     At approximately 3:46pm, BELL called the CI from cellular telephone number (630) 306-5128. BELL told the CI that he did not want to lie to him/her and that he only had approximately 14.0 grams. The CI then asked BELL if he had "Two Onions". I know that "Onions" is street slang used in place of ounces. Before BELL could answer, the CI asked BELL if HINES had any crack cocaine. The CI also asked BELL if the two ounces would weigh out right, to which BELL replied in the affirmative.

6

The CI also asked BELL how much the crack would cost, to which BELL replied HINES wanted $1400.00.

17.   At approximately 3:55pm, Special Agent Garcia searched the person of the CI for contraband with negative results. The CI further was equipped with electronic monitoring and recording devices. This equipment was activated at approximately 4:00pm by law enforcement, at which time the CI took control of his/her vehicle and departed the area. At approximately 4:03pm, BELL contacted the CI and asked where he/she was at. The CI advised BELL that he/she would be at the agreed upon location in approximately three (3) minutes. BELL advised the CI he was currently driving on Randall Road.

18.   At approximately 4:05pm, as observed by surveillance agents, the CI arrived at the Brown's Chicken Restaurant, located at 2115 W. Galena Boulevard, Aurora, Illinois. At approximately 4:12pm, BELL called the CI and advised him/her to move to the McDonald's parking lot right across the street (2011 W. Galena Boulevard, Aurora, Illinois 60506). BELL also told the CI he was in a grey car. After the call, the CI advised special Agent Garcia of the contents of the call. At approximately 4:15pm, as observed by surveillance agents, the CI relocated to a parking space next to a silver Nissan Maxima bearing unknown Illinois registration. At this time, as observed by surveillance agents, BELL exited the Nissan Maxima and entered the passenger seat of the CI's vehicle. During their meeting (based on the post-incident debriefing of the CI), BELL produced the crack from his pants pocket. The CI then weighed the crack, and BELL stated in this recorded conversation that the weight was correct [that is, that the crack weighed 2 "onions" (ounces)]. BELL further advised the CI that they (BELL and

7

HINES) were going to pick up more crack cocaine. The CI advised BELL to call him/her. BELL then advised that he (BELL) would have more crack cocaine around 4:30pm. At approximately 4:16pm, as observed by surveillance agents, BELL exited the CI's vehicle and re-entered the Nissan Maxima at which time ISP Inspector Dennis Carroll captured BELL on video. BELL and the CI then departed in different directions.

19.　The CI then met Special Agent Garcia at a pre-determined location where he/she provided him with a plastic baggie containing a chunky yellow substance (suspect crack cocaine). Special Agent Garcia then searched the CI's person for contraband with negative results. Sergeant Backus then searched the CI's vehicle for contraband with negative results. Special Agent Garcia later weighed and field tested the suspect crack cocaine. The suspect crack cocaine weighed approximately 55.7 grams and field tested positive for the probable presence of cocaine. Special Agent Garcia, who has been in the Illinois State Police for more than 5 years and has participated in more than 50 crack-cocaine cases and has observed crack cocaine more than 50 times, believes the suspect crack cocaine purchased from BELL by the CI on April 11, 2007, is crack cocaine based on its appearance.

20. On August 24, 2007, ISP Forensic Scientist Barbara A. Schuman weighed and examined the suspect crack cocaine previously purchased from BELL by the CI on April 11, 2007. Her findings, detailed in Laboratory Case Report #R07-001995, report the exhibit weighed 50.2 grams and tested positive for the presence of cocaine base.

_____
DAVID J. BALKEMA
Special Agent, ATF

Sworn to and subscribed to before me on this 26th day of November 2007.

_____
JEFFREY COLE
United States Magistrate Judge